UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RONALD BOLAND,<br><br>        Plaintiff,<br><br>-against-<br><br>SOLITON INC., BRADLEY HAUSER, WALTER KLEMP, CHRISTOPHER CAPELLI, JONATHAN FOSTER, DANIKA HARRISON, NIQUETTE HUNT, and MICHAEL KAMINER,<br><br>        Defendants. | Case No.: _____<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

  Plaintiff, Ronald Boland ("Plaintiff"), by the undersigned attorneys, for this complaint against Defendants, alleges upon personal knowledge with respect to Plaintiff, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

  1. This is an action brought by Plaintiff against Soliton, Inc. ("Soliton" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Soliton, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed merger (the "Proposed Transaction") of Soliton by and among affiliates of AbbVie Inc. (collectively, "AbbVie") and Scout Merger Sub, Inc. ("Merger Sub").

  2. On or about May 10, 2021, Soliton and AbbVie announced an agreement and plan

1

of merger, pursuant to which Soliton would merge with and into affiliates of AbbVie (the "Merger Agreement").  Pursuant to the terms of the Merger Agreement, Soliton's shareholders would be entitled to receive $22.60 per share in cash for each share of Soliton common stock they owned (the "Merger Consideration").

3. On or about June 15, 2021, in order to convince Soliton's public common stockholders to vote in favor of the merger, the Defendants authorized the filing of a materially incomplete and misleading Schedule 14(a) Definitive Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC").

4. In particular, the Proxy contains materially incomplete and misleading information concerning the background of the Proposed Transaction and the valuation analyses performed by Soliton's financial advisors, Guggenheim Securities, LLC ("Guggenheim Securities" or the "Financial Advisors") regarding the Proposed Transaction.

5. The Proposed Transaction is expected to close during the second half of 2021 and the special meeting of the Company's shareholders to vote on the Proposed Transaction is scheduled to occur on July 20, 2021.  Therefore, it is imperative that the material information that has been omitted from the Proxy is disclosed prior to the special meeting, so Plaintiff can properly exercise his corporate voting rights.

6. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Soliton's public common shareholders sufficiently in advance of the upcoming shareholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the

Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

8. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

9. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, Soliton's securities trade on the Nasdaq Capital Market (the "Nasdaq"), which is headquartered in this District, rendering venue in this District appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

10. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Soliton common stock.

11. Defendant Soliton is a Delaware corporation with its principal executive offices located at 5304 Ashbrook Drive, Houston, Texas 77081. The Company's common stock trades on the Nasdaq under the ticker symbol "SOLY."

12. Defendant Bradley Hauser ("Hauser") is, and has been since November 2020, the Company's President and Chief Executive Officer, and has been a director of the Company since May 2018.

13. Defendant Walter Klemp ("Klemp") is, and has been at all relevant times, the Executive Chairman of the Board of Directors of the Company.

14. Defendant Christopher Capelli ("Capelli") is, and has been at all relevant times, the Company's Chief Science Officer and Vice Chairman of the Board of Directors of the Company.

15. Defendant Jonathan Foster ("Foster") is, and has been at all relevant times, a director of the Company.

16. Defendant Danika Harrison ("Harrison") is, and has been at all relevant times, a director of the Company.

17. Defendant Niquette Hunt ("Hunt") is, and has been at all relevant times, a director of the Company.

18. Defendant Michael Kaminer ("Kaminer") is, and has been at all relevant times, a director of the Company.

19. The Defendants identified in paragraphs 12 through 18 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the "Defendants."

**SUBSTANTIVE ALLEGATIONS**

I.  **Background of the Company and the Proposed Transaction**

20.  Soliton is a publicly traded Delaware corporation and medical device company with a novel and proprietary platform technology licensed from MD Anderson. Soliton's RESONIC™ Rapid Acoustic Pulse ("RAP") device uses rapid pulses of designed acoustic shockwaves to disrupt cellular structures in the dermal and subdermal tissue, which allows the disruption of targeted structures within the skin with only minimal discomfort. As a result, the technology is potentially useful in tattoo removal, cellulite treatment, fibrotic scar treatment, and other indications, and potentially reduces treatment-related downtime. Soliton's common stock trades on the Nasdaq under the ticker symbol "SOLY."

21.  Prior to the announcement of the Proposed Transaction, Soliton had excellent growth prospects. Indeed, on March 4, 2021, less than three months before the Proposed Transaction was announced, Soliton issued its Annual Report on Form 10-K for the fiscal year ended December 31, 2020, setting forth Soliton's clinical pipeline as follows:



22.  Also on March 4, 2021, Soliton also issued a press release entitled *Soliton Reports*

*Fourth Quarter and Full Year 2020 Results*, stating in part:

> Brad Hauser, Soliton's President and CEO, commented, "Despite the challenges presented by 2020, this was a transformative year for the Company, which has positioned us for long-term success and the upcoming initial launch of our RAP device in cellulite reduction and tattoo removal during the second quarter of 2021. We are extremely encouraged by the progress we made in preparation for our upcoming initial launch, as we received FDA 510(k) clearance for the RAP device in cellulite, bolstered our sales team by hiring aesthetic veteran Sean Shapiro as VP of Sales, and initiated the transition to manufacturing with our manufacturing partner. I am very excited to share that we have selected RESONIC™ as the brand name for our RAP device, which we believe captures our technology's foundation in sound and will provide a true identity for our technology with customers and consumers. While ensuring a successful initial launch remains our key priority, we are also encouraged by the promise our RAP device has demonstrated in selected adjacent indications, such as fibrotic scars and liver fibrosis. 2021 will be a pivotal year for the Company as we transition to a commercial company. We look forward to launching our RESONIC™ device in cellulite reduction and tattoo removal and driving its clinical progress across adjacent indications with our goal of delivering shareholder value."

23.     Thus, the Proposed Transaction comes at a time when Soliton's future success was not fully reflected by its share price.  As a result, the Proposed Transaction will "compensate" the Company's stockholders with cash that fails to adequately compensate them for the intrinsic value of their shares.

24.     Despite Soliton's intrinsic value and growth prospects, the Individual Defendants are agreeing to a merger that cashes out the Company's stockholders and deprives them the ability to partake in the Company's growth.  The Individual Defendants breached their fiduciary duties owed to the Company's stockholders by agreeing to the Proposed Transaction for the unfair Merger Consideration and allowing the unfair and flawed sales process to unfold in the manner that it did, which will cause Plaintiff and the Class to receive an inadequate Merger Consideration.

**II.     The Proposed Transaction**

25.     On May 10, 2021, Soliton and AbbVie issued a press release announcing the Merger Agreement, stating in part:

## ALLERGAN AESTHETICS TO ACQUIRE SOLITON, EXPANDING BODY CONTOURING PORTFOLIO

*-- Acquisition adds Rapid Acoustic Pulse technology platform for improvement in appearance of cellulite in the buttocks and thighs*

IRVINE, Calif. and HOUSTON, May 10, 2021 /PRNEWSWIRE/ -- Allergan Aesthetics, an AbbVie company (NYSE: ABBV) and Soliton (NASDAQ: SOLY) today announced a definitive agreement under which Allergan Aesthetics will acquire Soliton and RESONIC™, its Rapid Acoustic Pulse device which recently received U.S. Food and Drug Administration (FDA) 510(k) clearance and is a non-invasive treatment for the short-term improvement in the appearance of cellulite. The acquisition of Soliton expands and complements Allergan Aesthetics' Body Contouring treatment portfolio which includes CoolSculpting® Elite.

The novel platform technology uses non-invasive rapid, high-frequency sound waves to disrupt targeted cellular structures and connective tissue, physically impacting the fibrous septae beneath the skin that contribute to the dimpled appearance of cellulite. In clinical trial data submitted to the FDA, after a single treatment session RESONIC™ demonstrated significant improvement and strong patient satisfaction with 92.9 percent of subjects agreeing or strongly agreeing their cellulite appeared improved.

"There is a huge unmet need to address cellulite and effective treatments have been elusive and frustrating for consumers," said Carrie Strom, President, Global Allergan Aesthetics and Senior Vice President, AbbVie. "Soliton's technology offers a new, completely non-invasive approach with clinically-proven results to reduce the appearance of cellulite with no patient downtime.  The addition of this technology complements Allergan Aesthetics' portfolio of body contouring treatments. Health care providers will now have another option to address consumers' aesthetic concerns."

"Allergan Aesthetics' brand recognition, global footprint, track record and commitment to developing best-in-class aesthetic treatments makes the Company ideally suited to maximize the commercial potential of the RESONIC™ rapid acoustic pulse technology," said Walter Klemp, Executive Chairman, Soliton. "I am proud of the passion and accomplishments of the Soliton team and thankful for the ongoing support of our investors which have culminated in this transaction. We look forward to working with Allergan Aesthetics to ensure a successful completion of this transaction."

Under the terms of the transaction, Allergan Aesthetics will pay $22.60 per share in cash for each outstanding share of Soliton.  Soliton's enterprise value for the transaction is approximately $550 million and was approved by the Boards of Directors of both companies.  The transaction is subject to customary closing conditions, including clearance by the U.S. antitrust authorities under the Hart-

Scott-Rodino Act and approval of Soliton's shareholders. Guggenheim Securities served as financial advisor to Soliton and Hogan Lovells served as legal counsel to Soliton. RESONIC™ has also received FDA 510(k) clearance for use in conjunction with laser for tattoo removal and has demonstrated clinical results in fibrotic scars.

**III.    The Preclusive Deal Protection Devices**

26.    To the detriment of the Company's shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

27.    The Merger Agreement is protected by "no-shop" provisions that prohibit, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative acquisitions or business combinations.

28.    These Merger Agreement also contains "information rights" provisions, which require the Board to provide AbbVie with written notice of any Takeover Proposal and further require the Board to provide prior written notice of its intention to terminate the Merger Agreement in favor of any Superior Proposal and negotiate with AbbVie following receipt of the notice, so that AbbVie has the opportunity to adjust the terms and conditions of the Merger Agreement so that the Takeover Proposal ceases to be a Superior Proposal.

29.    In addition, the Merger Agreement provides that the Company will be required to pay a termination fee of $18,625,000.00 with respect to any termination under the no-shop provision.

30.    Ultimately, these preclusive deal protection devices restrained and continue to restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The aggregate effect of these preclusive deal protection devices, viewed in light of the materially inadequate consideration

offered for the Company's shares in the Proposed Transaction and the flawed and conflicted negotiations process, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

31. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**IV.     The Proxy Omits Material Information**

32. On or about June 15, 2021, in order to convince the Company's public common shareholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of the materially incomplete and misleading Proxy with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

33. Specifically, the Proxy omits two types of material information: (i) information regarding the background of the Proposed Transaction; and (ii) financial information that renders the Financial Advisors' fairness analysis materially false, misleading, or incomplete.

A.    <u>The Proxy Omits Material Information Regarding the Background of the Proposed Transaction</u>

34. The Proxy fails to provide material information regarding the background of the merger that implicates the possibility that the Merger Consideration is inadequate.

35. The Proxy fails to disclose how and why Hauser and the Board came to the decision that Hauser – a former senior executive of Zeltiq and Allergan, which was acquired by AbbVie while Hauser was a senior executive – no longer needed to recuse himself from Board discussions involving Soliton's engagement with AbbVie after he was appointed Soliton's President and Chief Executive Officer in November 2020, at which point Hauser took a leading role in the discussions. This information is particularly material to Soliton's public shareholders because Hauser was first

appointed to the Board in May 2018, the resignation from the Soliton Board by Brent Ringle, the President of Remeditex Ventures LLC, Soliton's controlling shareholder.

36. The Proxy also fails to disclose the extent of any other relationships Hauser has with AbbVie or its subsidiaries and affiliates, including Hauser's twin brother, Bent Hauser, who was is a senior executive at AbbVie.

37. The Proxy also fails to disclose the extent to which the Strategic Alternatives Committee ("SAC") was actually adequately empowered to act independently and avoid issues arising from the conflicts of interest that Soliton knew affected its senior executives, including Hauser.  For example, the Proxy states that the SAC was formed on September 25, 2020 and empowered to decide "whether to enter into discussions with respect to the Potential Transaction") but also states that the Board may have *already decided to retain* Guggenheim Securities as a financial advisor with respect to the Potential Transaction before the SAC was formed.  *See* Proxy at 26-27:

> During late September 2020 into October 2020, representatives of Soliton and AbbVie prepared for an in-person meeting held on October 8, 2020 to observe the Soliton device in use.  Also during this period, the Board *and then the SAC after its formation*, having taken into account Guggenheim Securities' expertise in the aesthetic medical device industry and its familiarity with Soliton, among other factors, elected to retain Guggenheim Securities as its financial advisor and negotiated the terms of Guggenheim Securities' engagement.

B. <u>The Proxy Omits Material Financial Information that Renders the Company's Financial Advisors' Fairness Analysis Materially Misleading</u>

38. The Proxy also omits material information that renders the Financial Advisors' Fairness Analysis materially misleading.

39. The Proxy describes the Fairness Opinion and the various valuation analyses that the Financial Advisors performed to render its opinion but fails to provide enough information regarding the necessary data, support for conclusions, or the existence of, or basis for, the

underlying assumptions that underpin the fairness opinion. Specifically, the Proxy does not disclose enough information regarding the financial projections, inputs, and assumptions for various financial valuations. Without this information, stockholders cannot replicate the analyses, confirm the valuations, evaluate the Financial Advisors' opinion that the Merger Consideration is fair, or accurately assess the reliability of the Fairness Opinion. The informative value of the Fairness Opinion is not in its conclusions, but in the valuation analyses that support them. Thus, the key inputs, which are intrinsically baked into those conclusions, must also be fairly disclosed.

40. With respect to the Management Projections, the Proxy fails to disclose certain critical financial projections, including: (i) the Company's Net Income projections (the "Net Income Projections."), (ii) the Company's tax credits and net operating losses offset projections (the "Tax Attribute Projections"), and (iii) all of the line-items used to derive the Unlevered Free Cash Flow Projections, including Taxes, Capital expenditures, Changes in working capital, and any other line items used to determine Unlevered free cash flow. By providing this limited summary in the Proxy and withholding the omitted information, Defendants render the Management Projections in the Proxy materially incomplete and provide a misleading valuation picture of the Company. With respect to financial projections, directors are obligated to provide complete valuation metrics to shareholders, particularly in cash-out transactions where non-GAAP metrics were used by the banker, since such metrics are not uniformly defined and shareholders are therefore unable to assess the utility and legitimacy of the actual metrics without seeing the underlying components.

41. With respect to Guggenheim Securities' *Discounted Cash Flow Analysis* ("DCF") beginning on Page 48, the Proxy fails to: (i) fully disclose the rationale and basis for selecting a discount rate range of 11.55% to 14.30%, (ii) fully disclose the rationale and basis for applying a

11

perpetuity growth rate range of 2.0% to 3.0%, (iii) fully disclose the projected offsets from tax attributes, and (iv) provide a sensitivity table that presents the derived enterprise values across the full range of discount rates and exit multiples.

42.     This information is material to the Company's shareholders, and the omission of this information renders the summary of the *Discounted Cash Flow Analysis* incomplete and misleading.  As one highly-respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" *Id.*  As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value.  For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices**.  The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.*

*Id.* at 1577-78 (emphasis added).  Without the above-mentioned information, the Company's shareholders cannot: (i) evaluate for themselves the reliability of the *Discounted Cash Flow Analysis*, (ii) make a meaningful determination of whether the implied equity value ranges properly value the Company or were the result of an unreasonable judgment by the Financial Advisors, or (iii) make an informed decision regarding whether to vote in favor of the Proposed Transaction.

43.     With respect to Guggenheim Securities' *Discounted Future Value Analysis Based on Selected Publicly Traded Companies Analysis* beginning on Page 49, the Proxy fails to: (i) fully

disclose the rationale and basis for selecting a discount rate range of 12.0% to 14.0%, (ii) fully disclose the full rationale and basis for applying a multiple of 7.0x to 10.0x to the Company's projected Base Scenario 2023 Revenue, and (iii) provide a sensitivity table that presents the derived enterprise values for all three projection scenarios, and across the full range of discount rates and multiples.

44. With respect to Guggenheim Securities' *Selected Publicly Traded Companies Analysis* beginning on Page 50, the Proxy fails to disclose: (i) the objective criteria used to deem the selected companies relevant, (ii) which projection scenarios the analysis encapsulated, and (iii) the full rationale and basis for a applying a reference range of Calendar Year 2022E Revenue multiples of 6.5x to 8.5x, especially in light of the finding that 2023 was the projection year when Soliton would begin to have commercial scale more comparable to the publicly traded companies that were deemed relevant.

45. With respect to Guggenheim Securities' *Selected Precedent Merger and Acquisition Transactions Analysis* beginning on Page 50, the Proxy fails to disclose: (i) the objective criteria used to deem the selected transactions relevant, (ii) whether each transaction involved cash consideration, stock consideration, or a cash-stock mix, (iii) which projection scenarios the analysis encapsulated, and (iv) the full rationale and basis for a applying a reference range of Next Twelve Months Revenue multiples of 7.0x to 10.0x and a reference range of 2022E Revenue multiples of 7.0x to 10.0x.

46. With respect to Guggenheim Securities' *Premia/(Discounts) Paid in Selected Precedent Merger and Acquisition Transactions*, beginning on Page 51, the Proxy omits the footnotes detailing information respecting certain transactions.

47. Unlike poker where a player must conceal his unexposed cards, the object of a

proxy statement is to put all one's cards on the table face-up. In this case only some of the cards were exposed—the others were concealed. If a Proxy discloses financial projections and valuation information, such projections and valuations must be complete, accurate, and honest.  The question is not simply whether there is a duty to speak, but also whether there may be liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.  *See Campbell v. Transgenomic, et al.*, No. 18-2198 (8th Cir., March 1, 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases).  Accordingly, Defendants have disclosed some of the information related to the projections, assumptions, and inputs relied upon by Defendants' financial advisors, but have omitted crucial line items, reconciliations, and other information. Thus, Defendants' omission renders the projections and summaries disclosed in the Proxy misleadingly incomplete.

48. In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote his shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I
**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

49. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

50. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use

of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

51. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

52. The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

53. Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding the valuation analyses performed by the Company's Financial Advisors in support of its fairness opinion.

54. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were

misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

55. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that the Company's Financial Advisors reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by the Company's Financial Advisors, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to, separately, review the Company's Financial Advisors' analyses in connection with their receipt of the fairness opinions, question the Company's Financial Advisors as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

56. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The

Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

57. The Company is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

58. The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II
**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

59. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

60. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

61. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

62. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

63. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

64. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

65. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

66. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's

equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.   Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B.   Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.   Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 18, 2021

**OF COUNSEL:**

**ADEMI LLP**
Guri Ademi
Jesse Fruchter
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: gademi@ademilaw.com
        jfruchter@ademilaw.com

*Attorneys for Plaintiff*

**MONTEVERDE & ASSOCIATES PC**

/s/ Juan E. Monteverde
Juan E. Monteverde (JM-8169)
The Empire State Building 350 Fifth Avenue, Suite 4405 New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*